IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| CRYSTAL S.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 5:20-cv-00051 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| KILOLO KIJAKAZI | ) | By:   Joel C. Hoppe |
| Acting Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant.[2] | ) | |

Plaintiff Crystal S. asks this Court to review the Commissioner of Social Security's final

decision denying her application for supplemental security income ("SSI") under Title XVI of

the Social Security Act (the "Act"), 42 U.S.C. §§ 1381–1383f. The case is before me by referral

under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' filings,

oral arguments, and the applicable law, I find the Commissioner's decision is supported by

substantial evidence. Accordingly, I respectfully recommend that the presiding District Judge

affirm the decision.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v.*

*Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

reviewing the merits of the Commissioner's final decision asks only whether the Administrative

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

[2] Acting Commissioner Kijakazi is hereby substituted as the named defendant in this action. 42 U.S.C. §
405(g); Fed. R. Civ. P. 25(d).

Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 416.905(a).[3] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Crystal applied for SSI in February 2018, alleging disability because of degenerative disc disease, scoliosis, arthritis of the back, bursitis of the left shoulder, nerve damage in her feet and legs, uterine fibroids, diabetes, and an open incision in her abdomen from an infection. *See* Administrative Record ("R.") 197–205, 218, ECF No. 12. At the time of her application, she was forty-four years old, R. 197, making her a "younger person" under the regulations. 20 C.F.R. § 416.963(c). *See* R. 105. Disability Determination Services ("DDS"), the state agency, denied her claim initially in July 2018, R. 106–17, and upon reconsideration that October, R. 119–34. In September 2019, Crystal appeared with counsel and testified at an administrative hearing before ALJ Nicolas R. Foster. *See* R. 73–99. A vocational expert ("VE") also testified at the hearing. *See* R. 91–97.

ALJ Foster issued an unfavorable decision on October 30, 2019. *See* R. 56–66. He first found that Crystal had not engaged in substantial gainful activity since December 15, 2017, "the application date."[4] R. 58. Crystal suffered from the "severe" impairments of diabetes mellitus,

---

[4] ALJ Foster stated in his decision that Crystal applied for SSI on December 15, 2017, R. 56, but the record reflects that her application was filed on February 9, 2018, R. 197–205. Thus, the relevant period is from February 2018, the month Crystal filed for SSI, through the date of ALJ Foster's decision on October 30, 2019. *See Gray v. Berryhill*, No. 6:16cv9, 2017 WL 4296636, at *2 (W.D. Va. Aug. 8, 2017) (citing 20 C.F.R. §§ 416.202, 416.501), *adopted*, 2018 WL 1547364 (W.D. Va. Mar. 29, 2018).

degenerative disc disease, osteoarthritis of the shoulder, obesity, diabetic neuropathy, and fibromyalgia. R. 58. Crystal's depression and anxiety were "non-severe" as they did "not cause more than minimal limitation in [her] ability to perform basic mental work activities." R. 59. None of her "severe" impairments met or equaled any relevant Listing, R. 60–61 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.04, 11.14; SSR 12-2p; SSR 14-2p; SSR 19-2p).

ALJ Foster then evaluated Crystal's RFC and determined that she could perform "sedentary" work,[5] "except she [could] only occasionally climb ramps and stairs; occasionally stoop; never kneel, crawl, balance or climb ladders, ropes and scaffolds; never use foot controls; and require[d] a cane to ambulate." *Id.* Based on this RFC finding and the VE's testimony, ALJ Foster found that Crystal was unable to perform any of her past relevant work, R. 64, but that she could perform certain unskilled "sedentary" jobs, including information clerk, addressor, and parimutuel ticket checker, existing in significant numbers in the national economy, R. 65 (citing R. 93–94). Accordingly, he found Crystal was not disabled during the relevant time. R. 66. The Appeals Council declined to review that decision, R. 1–6, and this appeal followed.

### III. Discussion

Crystal raises six challenges to ALJ Foster's decision. *See generally* Pl.'s Br. 1–3, ECF No. 15. She argues the ALJ erred by (1) failing to consider a spreadsheet illustrating the frequency of her medical appointments in 2017–2019; (2) failing to consider the VE's testimony that Crystal's alleged "absenteeism, reaching and lifting restrictions and cane usage" would

---

[5] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools," 20 C.F.R. § 416.967(a), and generally requires sitting for about six hours, and standing/walking for about two hours, during an eight-hour workday, *Hancock v. Barnhart*, 206 F. Supp. 2d 757, 768 (W.D. Va. 2002). *See* SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996). Younger "[i]ndividuals who are limited to no more than sedentary work by their medical impairments have very serious functional limitations," SSR 96-9p, 1996 WL 374185, at *3, but are not presumed disabled unless they also are "illiterate or unable to communicate in English," *see* 20 C.F.R. pt. 404, subpt. P, app. 2 §§ 201.00, 201.17–201.29.

preclude full-time work, *id.* at 2; (3) relying on the "conservative" nature of Crystal's treatment as a basis for discrediting her subjective statements regarding her uncontrolled diabetes without acknowledging evidence that she "cannot afford the insulin" and did not "even own a glucose meter due to finances," *id.*; (4) failing to consider certain medical records documenting her "ongoing issues" trying to keep her diabetes and related symptoms under control; (5) failing to determine the extent of her ongoing issues with cellulitis; and (6) overlooking findings on one physical exam that "would confirm the diagnosis of Fibromyalgia," as well as Crystal's complaints of "chronic, widespread pain associated with" that impairment, *id.* at 3. Her arguments are not persuasive.

A.    *Summary*

1.    *Relevant Medical Evidence*

In December 2017, Crystal visited with Karen Adams, RN, for a diabetes checkup. R. 405. Crystal reported that she often forgot to take her morning pills for diabetes, although she did not "usually forget [her] evening pills." *Id.* ("I miss my morning doses some now, I was taking them good for a while, my son had put a reminder in my phone but I had to get a new phone and it doesn't have the reminder in it, I don't usually forget my evening pills[.]"). She had not taken the insulin that the doctor's office got for her because she "took the bag home and put it in the fridge and didn't even look in the bag." *Id.* She did not know if the office gave her needles, but her son said that he would inject her with insulin because there was "no way" she could do it herself. *Id.* She did not have enough money to "pick up [her] new diabetes pill for a few days." *Id.* Crystal told Nurse Adams that she "can't stand" to drink water and she "will not drink diet drinks [because] they are bad for you." *Id.* She liked sugar, though, and she believed that she "will go into withdrawals without it." *Id.* She could not exercise because she had "lots of

bulging discs" in her back, and she could not have surgery to treat uterine fibroids because her "sugar is too high." *Id.* Nurse Adams taught Crystal "how to store, draw up an inject insulin with a pen," but, "even with much encouragement," Crystal "refused" to practice injecting herself during this visit. *Id.* Nurse Adams explained that she "needs to find calorie free drinks" because regular sugary sodas "are not good for her either." *Id.* She also noted that Crystal had "Valley Health Financial Assistance" to cover medical services. *Id.* Crystal said she would pick up the new diabetes medication (Amaryl) and glucose-testing strips the next time she got paid. *Id.*

In January 2018, Crystal presented to the Emergency Department at Page Memorial Hospital, complaining of redness under her left breast that had been there for three days. R. 402. Examination revealed an "[a]rea of redness with mild tenderness and subcutaneous induration" on her chest. R. 403. The attending physician noted Crystal had a "soft tissue infection that appear[ed] to be appropriate for outpatient treatment with close follow-up." R. 404. "[N]o extensive cellulitic area or lymphangitic spread or signs of sepsis" were noted, and Crystal was diagnosed with cellulitis of the abdominal wall. *Id.* Crystal followed up with Elizabeth Roberts, NP, a couple days later, stating the area on her upper abdomen had worsened. R. 400. Her review of systems was positive for activity change, appetite change, fatigue, abdominal pain, redness and swelling in the upper abdomen, and sleep disturbance. R. 401. Examination revealed mild distress, mass in her abdomen, and tenderness in the left upper quadrant of her abdomen. *Id.* NP Roberts referred Crystal for an incision and debridement. *Id.* The following day, Crystal reported "severe" pain and significant changes to her abdominal wound. R. 371. Examination revealed tenderness, epidermolysis, and cellulitis in her abdomen. R. 373. John English, M.D., performed an incision and debridement of the wound that day. *Id.* Crystal denied pain the day after her surgery, but said she had some difficulty leaning on her left side. R. 382. She also denied

nutrition changes and said she still drank soda. R. 388. But she was "taking [the] sugar pills like [she's] supposed to," *id.*, and her diabetes was noted to be "better controlled compared to yesterday," R. 391. She had not had any cigarettes or regular sugary soda while hospitalized. R. 388. Crystal was started on Flagyl and Bactrim, R. 394, continued on Gabapentin and Norco, R. 395, and was awaiting the results of an anaerobic culture, R. 394.

After discharge, Crystal had a series of wound care appointments, including some to change her dressing. *See* R. 363–64, 366–67, 590, 609618, 628. Her wound was noted to be healing normally, although she initially had some difficulties with dressing changes because her son was not home to help her. R. 366, 609. By late January, however, she was "doing OK with her wound care at home," and was "doing her own dressing changes." R. 618. And, in early February an examination revealed that her wound appeared to be healing and had "[n]o surrounding cellulitis." R. 629. A few days later, Crystal expressed concern over the culture of her wound, but it was noted to be doing "quite well" and the "staph culture [was] indicative of colonization and not infection and as such [did] not need treatment at [that] time." R. 364. Examination revealed a small area of skin necrosis, but otherwise the wound looked "OK." R. 365.

In March, Crystal had a follow up appointment for diabetes. R. 646. She reported "noncompliance with her insulin regimen" and again said she did not take her insulin unless her son was at home to administer it. *Id.* She also reported "worsening peripheral neuropathy," intermittent chest pain, arthralgias of the knees, and back pain, *id.*, as well as numbness in her lower extremities, dysphoric mood, depression, and anxiety, R. 647. Later that month Crystal reported chronic lower back pain and shoulder pain. R. 650. She said her right shoulder pain radiated to her neck and felt like bursitis, which she reported having experienced in the past. R.

655. Examination revealed tenderness on the right side of her neck, decreased range of motion ("ROM") and tenderness in her right shoulder, and decreased ROM and bony tenderness in the lumbar spine. R. 656. Kayde Guenthner, NP, prescribed "a small number of Tramadol 50 mg for [Crystal's] acute pain." *Id.*

At a diabetes education appointment in April, Crystal reported that she was out of diabetic medications and testing strips because she could not afford them and that she had not taken Lantus in over a week because her son had not been home to give her the injection. R. 673. She acknowledged that "she feels better when she takes her medications as prescribed." *Id.* The registered dietitian encouraged Crystal to talk to her doctor about injecting insulin in her thigh so she could do it herself, rather than relying on her college-age son to inject it into the back of her upper arm. *See id.* In May, Crystal reported nausea, trouble eating, and depression, stating she had little motivation to leave her bed. R. 664. She had "gone without her medication for the past several weeks due to financial constraints," and she reported a lump under her right arm that had been there for several weeks, but it was not red or painful. *Id.* NP Guenthner assessed type 2 diabetes mellitus with hyperglycemia, upper abdominal pain, and a left axillary mass. R. 665. NP Guenthner also ordered imaging on Crystal's abdomen, *id.*, and labs for her diabetes, R. 666. The next day, it was noted that Crystal's labs looked "pretty good" but that her A1C had increased to 10.2, and she was told to increase her nightly Lantus dosage to fifteen units. R. 671. In late May, Crystal again reported noncompliance with her insulin regimen, stating that she did not "have reminders in [her] phone yet" and she still relied on her son to give "most of the doses." R. 820 ("I am not taking [my insulin] like I should. I did give myself two doses since I saw you last but most of the doses I have gotten my son has given me."). She had not been testing her glucose levels. *Id.* Crystal also reported depression and cracked skin on her foot that caused no pain. *Id.*

NP Adams "discussed [the] $4 cost of amaryl," which Crystal said she had not taken for "several months" because of the cost, and "encouraged [Crystal] to take her medications daily when she has access to them." *Id.* She also noted that Crystal could use a pumice stone and lotion to relieve her dry, cracked skin. *Id.*

In July, Crystal presented to Page Memorial Hospital, complaining of painful knots, chills, and "redness in the left upper inner thigh" that was noted to be similar to the skin infection under her left breast. R. 1070. Examination revealed and "area of open skin sore with frank pus drainage with surrounding area of redness and induration without any fluctuant mass as well as erythematous area on left upper inner thigh." R. 1073 (cleaned up). A CT scan of Crystal's pelvis demonstrated "findings compatible with cellulitis along the body wall." R. 1075. X-rays showed a "small fat-containing umbilical hernia without evidence of incarceration," lumbar degenerative disc disease, and "chronic appearing bilateral L5 pars defects with grade 1 anterolisthesis of L5 on S1." R. 1247. Crystal was diagnosed with sepsis and cellulitis of the groin, and she was transferred to Winchester Medical Center. R. 1076.

At Winchester Medical Center it was noted that Crystal was "noncompliant" with her diabetes medication, R. 1089; *see* R. 1186, and that she did not initially seek medical care, but did so after experiencing trouble walking, R. 1102. Examination revealed no tenderness in her abdomen, but there was "erythema and ulceration with clearish drainage on [her] left pubic area." R. 1105. It was also noted that Crystal was upset and ready to leave against medical advice because she could not smoke or drink soda in the hospital, R. 1186; *see also* R. 1188–89, and that she was eating Kentucky Fried Chicken ("KFC") during the medical team's bedside report, R. 1187, suggesting noncompliance with diabetes management, *id.* A later examination noted multiple ulcers and skin erythema in the left groin area and "[e]xpected" ROM in all extremities.

R. 1190. By day three of her hospital stay, Crystal reported "doing better" and said she had no

groin pain. R. 1193. Katja Schwartz, RN, instructed Crystal on administering insulin to herself,

and Crystal "state[d] she has given insulin to herself using the pen before." R. 1203. Crystal was

discharged four days later, *id.*, with "information on Shenandoah County Free Clinic for

medication assistance," R. 1186.

In late August, Crystal saw NP Guenthner for refills of the insulin and Amaryl that had

been restarted during her hospitalization, "which ha[d] really improved her blood glucose." R.

1296. Crystal also requested refills for Alprazolam and Tramadol for chronic back and joint pain,

and she wanted a referral to pain management. *Id.* NP Guenthner observed normal findings on

exam, and she assessed type 2 diabetes mellitus with hyperglycemia, chronic low back pain with

bilateral sciatica, chronic pain of multiple joints, and anxiety. R. 1297. NP Guenthner told

Crystal in early September that her A1C was 7.7, which NP Guenthner described as "excellent"

and encouraged Crystal to "[k]eep up the great work with the new insulin." R. 1175.

In October, Crystal followed up with NP Guenthner for her chronic lower back pain, left

shoulder pain, and generalized muscle pain, seeking a new referral to pain management. R. 1289.

Crystal's back pain was getting worse and radiated to her legs; she was "unable to stand for any

extended period of time," *id.*, had occasional lower-extremity weakness and falls, and

experienced "daily fatigue." *Id.* Her review of systems was positive for "arthralgias (left

shoulder), back pain and myalgias (multiple)," and dysphoric mood. *Id.* Examination revealed

decreased ROM and bony tenderness in her left shoulder, tenderness in her cervical back,

decreased ROM and bony tenderness in her lumbar back, depressed mood, and "tenderness to

palpation at 16 of the 18 sites in various muscle groups used in the diagnosis of fibromyalgia."

R. 1290 ("The 2 nontender sites were located at the occiput."). NP Guenthner assessed chronic

left shoulder pain, chronic low back pain, chronic pain syndrome, and myalgia. *Id.* She said she

would try to get another referral to pain management, and she ordered an X-ray of Crystal's left

shoulder and a lumbar MRI, noting Crystal's "symptoms ha[d] progressed." *Id.* She also noted

that Crystal's symptoms had improved with Gabapentin, and NP Guenthner increased her

dosage. R. 1289–90. Crystal returned just over a week later, stating that her left shoulder pain

had become severe and radiated into her left arm. R. 1307. An MRI of her lumbar spine showed

"[b]ilateral pars defects, as before, with prominent grade 1 anterolisthesis of L5 on S1 . . . and

moderate to severe bilateral neural foraminal narrowing at L5-S1, similar to prior" findings on an

MRI from June 2017, R. 1312. Her left shoulder X-ray demonstrated "advanced degenerative

changes in the glenohumeral joint." R. 1317.

In early November, Crystal again complained of left shoulder pain, stating it had been

ongoing for eight years, and she reported left arm weakness, decreased motion, chronic neck

pain, and anxiety. R. 1319. She described her pain as aching, shooting, stabbing, constant and

worsening and said it led to weakness, decreased ROM, stiffness, pain with activity, and night

pain. R. 1319–20. Examination revealed active forward flexion to 95 "then hard endpoint," full

abduction, negative Spurling's test, and painful movement. R. 1321–22. Crystal was assessed

with osteoarthritis of her left shoulder. *Id.* About a week later, Crystal made similar complaints

to Erik Mitchell, D.O., and she and Dr. Mitchell "discussed [that] . . . there [was] no great option

with regards to her left shoulder," and that "there may be options both surgical and nonsurgical."

R. 1386. Dr. Mitchell referred her for evaluation by the Orthopedics department at UVA Health.

*Id.*

In December, Crystal reported that her low back pain, which she described as a chronic,

moderate ache, had worsened over the past week and was worse with motion. R. 1342.

11

Examination findings were normal, including no tenderness or deformity on her musculoskeletal exam. R. 1344–45. An X-ray of Crystal's lumbar spine showed "evidence of L5 spondylolysis and grade 1 spondylolisthesis," decreased disc height at L5-S1, and "[m]ild degenerative disc disease [at] L2-3," but "[n]o acute findings." R. 1345.

In January 2019, Crystal said she had cracked skin on both heels; a warm and red area around her left heel that had been present for three days; recent struggles with anxiety, depression, and insomnia; and left hand numbness and tingling for several months, and she expressed concern over a prior brain MRI and a reported family history of cardiomyopathy. R. 1411–12. On exam, Crystal had labile affect, dry skin on her right foot, and erythema, warmth, and dry skin on her left foot. R. 1412. NP Guenthner prescribed Clindamycin for three days for her heel, ordered MRIs of her brain and cervical spine, ordered an echocardiogram, and referred her to psychiatry at UVA Health. R. 1413. In January, an echocardiogram showed that Crystal did "not have cardiomyopathy." R. 1363.

Later in January Crystal followed up with NP Guenthner for pain management. R. 1415. Crystal reported that physical therapy, injections, Tramadol, and Gabapentin did not offer adequate pain relief. *Id.* Her current pain level was zero-out-of-ten, although she stated that her pain gets up to a nine-out-of-ten on her worst days. *Id.* Crystal said her pain contributed to her depression, she "struggle[d] to get out of bed," and she was "unable to ambulate or stand for extended periods thus limiting her ability to participate in activities she once enjoyed." R. 1416. On exam, NP Guenthner observed osteoarthritic changes in both of her hands, bony tenderness and limited ROM in her left shoulder, limited ROM in her back, pain with motion in her back, and antalgic gait. R. 1418.

In late January, a brain MRI showed no hemorrhage or acute ischemic change. R. 1369. A cervical MRI displayed degenerative changes at multiple levels, "a circumferential disc osteophyte complex which appear[ed] worst in the left paracentral/foraminal regions" and "abut[ted] and deform[ed] the left hemicord," "[m]ild narrowing of the central canal" at C3-C4 and C6-C7, and "[m]oderate left foraminal narrowing" at C5-C6. R. 1603–04.

At a diabetes check in February, Crystal was doing "fairly well" and was using a blood glucose meter, but she said she was not sure how much longer she would be able to afford her diabetes supplies because insurance did not cover the full cost. R. 1424. Her review of systems was positive for arthralgias, back pain, myalgias, and neck pain, but examination findings were unremarkable. R. 1425. NP Guenthner referred Crystal to the Neurology department at UVA Health for further evaluation and treatment of cervical radiculopathy. *Id.*

An X-ray of Crystal's shoulder performed in February showed "[s]evere glenohumeral joint and mild to moderate AC joint degenerative change." R. 1554. Crystal rated her pain as a six-out-of-ten, and an examination revealed tenderness in her left bicipital groove and left greater tuberosity. R. 1559. Jeremy Rush, M.D., outlined a conservative treatment plan that consisted of a steroid injection in her left shoulder and follow up appointment four-to-six weeks after the injection. R. 1560.; *see also* R. 1919 (steroid injection of left shoulder on February 27, 2019).

About a week later, Crystal saw Katarina Topchyan, M.D., for evaluation of her diabetes. R. 1445. She was taking Metformin, Glimepiride, and Lantus insulin. *Id.* Crystal's review of systems was positive for fatigue, lightheadedness, blurred and double vision, abdominal pain, nausea, headaches, numbness, tingling, joint and muscle aches, back pain, depressed mood, and excessive nervousness. R. 1446. Examination revealed "decreased or absent sensation to monofilament" in both feet, worse on the right; decreased sensation above her ankles; calluses,

thickened skin, and cracks with sanguinish discharge on her heels; swelling and tenderness to palpation of her right heel; and her "soles [were] pretty much with lost sensation, especially worse on the right." *Id.* It also showed skin on her right shin damaged by a large lesion, "which look[ed] like a necrobiosis lipoidica," and several smaller lesions around it, as well as a small lesion on her left shin. *Id.* Dr. Topchyan assessed uncontrolled diabetes complicated by neuropathy and nephropathy. *Id.* She also noted that Crystal had cellulitis of her right heel, and she prescribed Bactrim Double Strength twice a day for ten days. R. 1447. Crystal was referred to a podiatrist for her diabetes-related cellulitis and to a dermatologist for her necrobiosis lipoidica diabeticorum. *Id.*

Crystal had a diabetic foot check with UVA Health in April 2019. R. 1866. She complained of a loose right hallux toenail and split and callused skin on her heels. *Id.* Crystal "denie[d] recent attempt[s] at self care" despite "admit[ting] to numerous infections requiring antibiotics because of her split heels in the past," and she "ha[d] not been using skin lotions as advised." *Id.* Her review of systems was positive for edema in her lower extremities and numbness and paresthesias of her feet. *Id.* It was noted that she had a small cut across her right big toe of which she was unaware because of a loss of protective sensation. *Id.* Examination revealed palpable pedal pulses bilaterally, no gross edema, no acute joint pain or effusion, non-antalgic gait, decreased protective sensation in her toes, dry skin and scabbed fissures in her heels, no cellulitis, a right hallux nail distal lysis with a bruise, and a scabbed laceration over her right hallux. *Id.* Crystal's "very poor" foot hygiene and poorly controlled diabetes  were noted, and she and Bryan Snyder, DPM, discussed "the importance of proper shoes, better foot hygiene and reg[ular] self-inspection" to avoid further diabetes complications arising with her lower extremities. R. 1867.

14

A few days later, Crystal saw Vernon Forrester, M.D., for an evaluation of a rash on her lower extremity that had been present for fifteen years. R. 1858. Examination revealed "approximately 15 cm yellow plaque on [her] right [s]hin with overlying atrophy and visible telangiectasias." R. 1859. Dr. Forrester noted that Crystal did not appear to have necrobiosis lipoidica on clinical examination. *Id.* He "recommend[ed] that she discontinue smoking and obtain better glucose control," and he "defer[red] treatment at th[at] time." *Id.*

Later in April, Crystal had a follow up for her osteoarthritis in the glenohumeral joint of her left shoulder. R. 1827. She reported that the injections she received in late February provided about three weeks of relief, but that her symptoms had since worsened. R. 1831. She noticed increased pain, which she rated a three-out-of-ten. *Id.* Examination showed intact cervical ROM, "no focal motor or sensory" deficits, negative Spurling's test, slightly decreased (4+/5) strength in the left upper extremity, and tenderness in the left bicipital groove and greater tuberosity. R. 1832. Stephen Brockmeier, M.D., recommended that Crystal undergo a total shoulder arthroplasty of her left shoulder, and she agreed to go forward with the procedure. R. 1832–33.

Crystal had another diabetes follow up in early May. R. 1753. At that time, it was noted that the cellulitis of her right heel was "resolved" and that no treatment was recommended for her necrobiosis lipoidica diabeticorum. R. 1755. Crystal's review of systems was positive for fatigue, blurred vision, eye pain, headaches, numbness, tingling, joint and muscle aches, height loss, back pain, dry skin, depressive mood, and excessive nervousness. *Id.* Dr. Topchyan's examination findings were unchanged from Crystal's February visit with her. R. 1756.

In late June, Crystal underwent a total arthroplasty of her left shoulder with UVA Health. R. 1989–96. On post-operative exam, she "was neurologically intact throughout her extremities once the regional block had worn off with intact motor function and brisk capillary refill

distally." R. 1996. Crystal "worked with therapy and was able to ambulate safely," and she was

discharged to home in stable condition two days later. *Id.*

In July, Crystal again complained of split calluses on her heels, and she said she had

trouble applying foot lotions because of her obesity. R. 1951. Examination revealed palpable

pedal pulses bilaterally, no acute joint pain or effusion, and non-antalgic gait. R. 1951. It also

showed a loss of protective sensation in her toes, poor foot hygiene, and heavily callused fissures

of the posterior heel areas, left greater than right, but there was no cellulitis. R. 1952. Dr. Snyder

noted that Crystal's diabetes was still under "poor control," again spoke with her "about the

importance of proper shoes, better foot hygiene and reg[ular] self-inspection" to avoid recurring

problems, and he instructed her to follow up in three months. R 1952; *see* R. 1866 ("Her DM is

admittedly under poor control."). At Crystal's two-week follow up for her shoulder surgery in

July, she was noted to have minimal discomfort with passive ROM and was "[d]oing very well

in terms of pain in the early phase of recovery." R. 2262. Later in July, Crystal complained of

knee pain. R. 2235–42. It was noted that she had begun physical therapy for her shoulder, R.

2237, 2240–41, had not been adhering to a low-carb diet, *id.*, and her A1C had increased to 8.3,

R. 2240. Examination revealed crepitus in her knee, right greater than left. *Id.* Preston Reynolds,

M.D., Ph.D., ordered an MRI of Crystal's left knee and instructed her to increase her Lantus

intake. *Id.* In late July, Jacqueline Hodges, M.D., prescribed Crystal a cane for osteoarthritis of

multiple joints to facilitate walking. R. 2304.

At an appointment in September, Crystal reported a history of daily tension headaches

occasionally accompanied by blurry vision. R. 2310. Examination findings revealed some

muscle weakness (4-/5 to 5/5) in her left arm, but no other remarkable findings. R. 2313–14.

Kenneth Leone, M.D., noted that although Crystal's January brain MRI demonstrated white

matter disease, it was "not consistent with a demyelinating condition and [was] more supportive of a diagnosis of chronic small vessel disease." R. 2315. He said treatment of chronic small vessel disease "largely consists of controlling risk factors including blood pressure, diabetes, cholesterol and smoking." *Id.* Dr. Leone noted that Crystal's "objective left arm weakness could be consistent with previously noted cervical disc disease," and that her subjective daily headaches with photophobia were "consistent with chronic migraine." *Id.*

In September, Crystal presented to UVA Health, expressing concern that she had an infection of her left foot. R. 2323. *Id.* She also reported ongoing mild right knee pain from having hit a rock when walking in a river two weeks prior. R. 2323–24. Examination revealed "dry, cracked skin and surrounding erythema" in her left heel that went up to the ankle; no streaking, crepitus, joint tenderness or effusion; warmth and mild tenderness to palpation; minimally limited ROM from pain; no ulceration or drainage; and weight bearing ability. R. 2324. Athidi Earasi, M.D., assessed nonpurulent cellulitis of the left ankle/heel, right knee injury, essential hypertension, and type 2 diabetes mellitus. R. 2324–25. Crystal was started on Clindamycin for her cellulitis and told to follow up in four days. R. 2324. At her follow up, she continued to display dry, cracked skin with surrounding erythema at her left heel, but it was noted to be "much improved since 4 days prior." R. 2321 (cleaned up). Further, she had less warmth, no tenderness to palpation, and her ROM was no longer noted to be painful. *Id.* Dr. Earasi observed that her "cellulitis [was] significantly improved" that day. *Id.*

### 2.    *Crystal's Statements*

In June 2018, Crystal submitted a Function Report to DDS. R. 235–43. Her diabetes, nerve damage in her feet and legs, back pain, high blood pressure, cholesterol, anxiety and depression limited her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see,

complete tasks, and concentrate. R. 241, 243. On a typical day, she would wake up, use the

bathroom, eat, and take her medicine before returning to bed; some days she could wash dishes

and do laundry. R. 236. She took care of her teenage daughter. R. 237. Her nerve issues and back

pain made it so she could not sleep most nights, and she had difficulty even with routine personal

care tasks, such as shaving and getting dressed. *Id.* She could cook simple meals and did so about

three-to-four times each week, but she needed to sit and take breaks while doing so. R. 238. She

could not do yard work or household tasks besides washing dishes and laundry for short periods

of time. *Id.* She could drive, and she went grocery shopping for twenty minutes at a time once a

week, but her husband assisted her, and she leaned on the cart for support. R. 239–40. Her

anxiety made her "more of a homebody," and it was "difficult to do anything." R. 241. She could

walk a maximum of ten minutes before needing to rest for a couple minutes. *Id.* She also used a

cane to walk. R. 242.

Crystal submitted a second Function Report to DDS in September 2018. R. 257–64. Her

daily activities remained the same. R. 258. Her shoulder and back pain continued to cause

trouble sleeping, and she had difficulty tending to her personal care without her husband's

assistance. R. 258. Her ability to cook depended on how she was feeling on a given day, but she

would make complete meals about twice a week for thirty minutes to an hour. R. 259. She still

washed dishes or did laundry when she felt well enough, and she was still unable to do yard

work. R. 260. Crystal's confusion created issues handling money. R. 261. Her only hobbies were

watching television and playing games on her phone, and Crystal only went out for appointments

or to her eldest son's house. *Id.* She could lift items weighing fewer than twenty pounds, could

not stand for more than two hours a day, and could walk for only ten minutes before needing to

rest for about ten minutes. R. 262. She continued to use a cane on occasion when walking. R. 263.

In September 2019, Crystal testified before ALJ Foster. *See* R. 73–99. In his opening statement, Crystal's counsel said he had a spreadsheet listing her medical appointments or hospitalizations which purportedly demonstrated that her conditions would cause such frequent absences from work as to preclude her from meaningful employment. R. 78 ("[W]e have a spreadsheet of her visits for medical care. Either visits for medical care or hospitalizations is in 2019, year to date so far, 44 days that she either had medical care or [was] in the hospital. In 2018, it was 41 days. And in 2017, it was 20 days."); *see also* R. 80–81, 195. The attorney showed the spreadsheet to Crystal during her testimony, and she confirmed that it listed 20 "visits" for medical care in 2017, 41 visits in 2018, and 44 visits so far in 2019. R. 80. He did not ask any questions about how long the visits lasted or what times and days of the week they were scheduled. Crystal testified that she did physical therapy three times a week for her left shoulder, R. 80–81, and she was "not supposed to lift over five pounds," R. 81. Her diabetes affected her vision and caused brain fog and forgetfulness. R. 82–83. She continued to experience difficulty sleeping and averaged about five hours of sleep per night. R. 84. Her neck and back pain affected her daily routine, R. 85–86, and neuropathy in her hands caused issues with gripping, R. 86. Her husband had to assist her putting on her shoes, and one foot felt like "needles," whereas the other felt like it was "tickling" her. *Id.* She could not "even sit for an hour without getting up," had trouble balancing, and still used a cane to walk and to get up from a seated position. R. 90.

B.    *The ALJ's Decision*

At the outset of his decision, ALJ Foster noted that Crystal submitted "additional written evidence" fewer than five days before the hearing and that he "admit[ed] this evidence into the

record" despite its late production. R. 56; *see* R. 75–76 (noting that Crystal "brought some additional medical records" from UVA Health to the hearing and instructing counsel to submit them electronically). ALJ Foster found that Crystal had "severe" impairments of diabetes mellitus, degenerative disc disease, osteoarthritis of the shoulder, obesity, diabetic neuropathy, and fibromyalgia. R. 58. In determining whether Crystal's "severe" impairments met or equaled any relevant Listing, ALJ Foster examined her fibromyalgia pursuant to Social Security Ruling ("SSR") 12-2p. R. 61. He explained as follows:

> A diagnosis of fibromyalgia must be made by a physician and it must be consistent with a history of widespread pain in all four quadrants of the body which has persisted for at least 3 months; at least 11 positive tender points found on physical examination, or repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions; and evidence that other disorders that could cause the symptoms or signs were excluded.

*Id*. He then observed that Crystal "demonstrated positive trigger point[s] at one occasion, and has generalized complaints of myalgia," but he found that she had "not presented with widespread pain in all four quadrants for at least three months sufficient to meet any listing section." *Id.* Also at step three, the ALJ noted that Crystal's diabetes was "poorly controlled," but she had been noncompliant with diet and skin care treatment recommendations. R. 60. Moreover, when Crystal used insulin therapy, her diabetes was under "some control." R. 61. Her severe diabetic neuropathy caused "limitations in standing and walking, but she [was] able to ambulate, arise from a seated position," and did not have an "extreme limitation in the ability to . . . balance while standing or walking." R. 60.

ALJ Foster then determined that Crystal had the RFC to perform "sedentary" work with additional postural limitations and that she required a cane to ambulate. *Id.* He acknowledged her allegations that she "cannot work due to fatigue and pain," that she "uses a cane to get up from a chair, and on other days when she feels she needs it" to walk, and that she "cannot stand or walk

for very long." R. 62–63. ALJ Foster found that Crystal's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that her "statements concerning the intensity, persistence and limiting effects of th[o]se symptoms [were] not entirely consistent with the medical evidence and other evidence in the record" for the reasons explained elsewhere in his decision. R. 62. Regarding Crystal's complaints that her physical impairments made her unable to stand or walk for long, caused fatigue, and limited her ability to perform routine daily tasks, ALJ Foster found that the objective evidence did not "fully support these statements." R. 63. He noted that examinations did "occasionally reveal tenderness of the back and shoulders and decreased strength in the lower extremities" and fatigue, but he found those "abnormalities [were] not present consistently, and generally, [Crystal] demonstrate[d] full range of motion of the back and extremities and negative straight leg raise." *Id.* Next, ALJ Foster observed that "on occasion, examinations show cellulitis secondary to diabetes, and diabetic neuropathy." *Id.* He found, however, that Crystal's course of treatment for these issues was "conservative," and that "[c]linicians ha[d] not advised her to pursue more aggressive treatment." *Id.* ALJ Foster then noted that Crystal was "able to care for her personal needs, do housework and laundry, drive, play games on her phone, watch television and grocery shop." *Id.* He concluded that although Crystal did "experience some symptoms because of her severe impairments, the objective findings contained in the record, the conservative care [she] received, and her admitted ability to perform a variety of daily tasks all suggest that these symptoms are not as limiting as she claims." *Id.*

C.    *Analysis*

Crystal primarily challenges the sufficiency of the ALJ's consideration of certain evidence of her treatment and impairments and his RFC finding. "[T]he Commissioner's

decision must 'contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based.'" *Reid v. Comm'r Soc. Sec. Admin.*, 769 F.3d 861, 865 (4th Cir. 2014) (quoting 42 U.S.C. § 405(b)(1)). Further, "[a]n ALJ has the obligation to consider all relevant . . . evidence and cannot simply cherry-pick facts that support a finding of disability." *Lewis*, 858 F.3d at 869 (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). Where the ALJ says he considered certain evidence, and the record does not contradict the ALJ's assertion, the Fourth Circuit instructs district courts to take the ALJ at his word. *Reid*, 769 F.3d at 865 ("The Commissioner, through the ALJ and Appeals Council, stated that the whole record was considered, and, absent evidence to the contrary, we take her at her word."). Where the ALJ "both identif[ies] evidence that supports his conclusion and build[s] an accurate and logical bridge from that evidence to his conclusion," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (emphasis omitted), it is not the province of a reviewing court to "weigh the evidence," *Boston v. Barnhart*, 332 F. Supp. 2d 879, 890 (D. Md. 2004), or to substitute its own judgment for that of the ALJ, *Davis v. Barnhart*, 392 F. Supp. 2d 747, 751 (W.D. Va. 2005) ("[T]he Fourth Circuit has . . . admonished that it is the role of the ALJ, and not reviewing courts, to resolve conflicts in evidence."). *See generally Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018) ("This court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. There were a number of conflicts in the evidence here, and we do not second guess the ALJ in resolving those conflicts. In our view, the justification provided by the ALJ—albeit somewhat sparse—was sufficient to allow us to determine that the ALJ performed an adequate review of the whole record and that the decision is supported by substantial evidence.").

### 1.    Consideration of Spreadsheet

Crystal first argues that ALJ Foster failed to consider, or assign an exhibit number to, a spreadsheet of her medical appointments that she contends shows that she would miss work to such an extent that she could not maintain full-time employment. Pl.'s Br. 1–2. "Social Security hearings are non-adversarial and the ALJ has a duty to develop the record, this duty is discharged, however, so long as 'the record is adequate to make a determination regarding a disability claim.'" *Greco v. Astrue*, No. 7:11cv399, 2012 WL 6861354, at *9 (W.D. Va. Dec. 27, 2012) (quoting *France v. Apfel*, 87 F. Supp. 2d 484, 490 (D. Md. 2000)) (internal citations omitted). This means that "the medical evidence of record need only be complete enough to make a determination regarding the nature, effects, and duration of a claimant's [alleged] disability and the claimant's RFC." *Boyd v. Astrue*, Civ. No. BPG-09-150, 2010 WL 3369362, at *4 (D. Md. Aug. 23, 2010) (citing 20 C.F.R. § 416.913(e)).

Here, Crystal does not argue "that the record before the ALJ was so inadequate that a disability determination could not be made." *Greco*, 2012 WL 6861354, at *9. Nonetheless, she maintains that it was error for the spreadsheet not to have been considered or incorporated into the administrative record. Pl.'s Br. 1–2. Notably, Crystal did not provide this Court with the spreadsheet, *see* 42 U.S.C. § 405(g) (sentence six), although the transcript of the administrative hearing suggests that a copy was provided to the ALJ either immediately before or during that proceeding, R. 80 ("Q. . . . I'm asking you to review this spreadsheet that we submitted. Does this reflect in 2017 your number of visits? A. Yes."). *See also* R. 195 ("This spreadsheet of yearly visits (no Exhibit number has been assigned to this sheet in the record) shows the ongoing medical appointments that [Crystal] attended."). According to Crystal's description of the spreadsheet, it documents her medical-visit history and demonstrates that, if she had been

employed, she would have missed twenty full days of work in 2017, forty-one full days of work in 2018, and forty-four full days of work in 2019. Pl.'s Br. 2. Crystal contends that these "necessary medical appointments" demonstrate that she would suffer a rate of absenteeism that would preclude her from performing gainful, competitive work. *Id.* ("An employer will not tolerate more than an average of 1 ½ days of absenteeism per month."); *see also id.* (noting the VE's testimony that "there would be no job in the national economy" for someone who missed work on each day Crystal had medical visits in 2017–2019) (citing R. 94). The Commissioner argues that consideration of the spreadsheet was unnecessary as the "the ALJ had the actual underlying medical records available to him, which he reviewed." Def.'s Br. 7 ("He did not need a summary spreadsheet to review such information, when such information was available in its original format elsewhere in the record."), ECF No. 17. I agree.

First, as the Commissioner recognizes, the spreadsheet would merely summarize information already considered by the ALJ when he reviewed the actual treatment records. Moreover, even had the ALJ considered this demonstrative spreadsheet, it does not necessarily establish what Crystal claims it does. While the record reflects that Crystal did frequently have medical appointments during the relevant time, many of the records do not reveal the times or duration of these appointments, and thus do not establish that Crystal would be required to miss a full day of work to attend them. *See Martin v. Berryhill*, No. 7:16-CV-260-KKC, 2018 WL 1571906, at *4 (E.D. Ky. Mar. 30, 2018) ("Martin claims the ALJ failed to properly consider her absenteeism necessitated by her doctor's appointments. But Martin has not identified any evidence on the record that the length of these appointments would require her to miss work.") (citing *Barnett v. Apfel*, 231 F.3d 687, 691 (10th Cir. 2000); *see also Jeffries v. Berryhill*, No. 4:16 CV 18 JMB, 2017 WL 365439, at *6 (E.D. Mo. Jan. 25, 2017) ("Although Plaintiff argues

24

that it is 'incontrovertible' that she will miss numerous days, the record does not support this argument and substantial evidence supports the ALJ's RFC determination. At best, Plaintiff proved how many times she has visited a doctor, but she did not show that each doctor's visit would result in her missing an entire day of work."). To be sure, any weekday hospital admission would result in missing a day of work, and an admission for an unscheduled emergency could cause Crystal to miss work too. Most of Crystal's medical visits, however, were scheduled, follow-up appointments for chronic impairments, rather than emergency treatment. She was admitted to a hospital only twice, each for several days, during the three-year relevant period. Although Crystal certainly had many medical visits during the relevant time, she offered no evidence that she would be unable to schedule her medical appointments outside of work hours were she employed. *See, e.g.*, *Stone v. Berryhill*, No. 17-CV-3193, 2018 WL 5300381, at *19 (C.D. Ill. Oct. 24, 2018) ("Stone is speculating on what she would have done had she been working. If Stone had been working, she might have scheduled her medical appointments on her days off or combined appointments. No one knows. No one knows because this argument is all speculation. The ALJ did not err in omitting such speculation from her decision. If numbers of doctors' visits alone could establish disability, claimants would only need to schedule enough visits.").

Furthermore, to the extent Crystal's argument relies on past medical visits to prove disability into the future, no medical provider opined that she would struggle to maintain consistent workplace attendance based on her many medical visits. *See Prudich v. Saul*, No. 1:20-19, 2021 WL 933864, at *4 (S.D. W. Va. Mar. 11, 2021) ("To prove future appointments, she merely points to the medical appointments memorialized in the record and says that the proof of absenteeism is self-evident. To rely on past appointments to predict future appointment,

however, there must be *evidence* that one is a reliable indicator of the other." (citing *Lara v. Berryhill*, No. 4:16cv564, 2018 WL 1744534, at *3 (E.D. Mo. Apr. 11, 2018)). Accordingly, I find no error in the ALJ's not considering the spreadsheet independently of the medical records themselves.

    2.    *The VE's Testimony*

Crystal also contends that the ALJ erred by "fail[ing] to consider the testimony of the Vocational Expert and [finding] that the opinion of the Vocational Expert was 'inconsistent.'" Pl.'s Br. 2. Although Crystal does not develop this argument, she appears to contend that ALJ Foster rejected the VE's testimony because it was "inconsistent" with other unidentified evidence. Her contention reflects a misunderstanding of the ALJ's finding. Rather, the ALJ accepted the testimony of the VE, but noted that it was "inconsistent" with Dictionary of Occupational Titles. R. 65 ("Although the vocational expert's testimony is inconsistent with the information contained in the Dictionary of Occupation Titles, there is a reasonable explanation for the discrepancy."). To the extent Crystal contends that the ALJ did not offer an adequate explanation for finding a "reasonable explanation for the discrepancy" between the VE's testimony and the DOT, such an argument is likewise unavailing. The ALJ's explanation does appear to be missing some context, stating only "education, experience and training in the field of vocational rehabilitation" with no prefatory clause following his unadorned finding that there was a "discrepancy" or "inconsistent[cy]" between the VE's testimony and the DOT. R. 65. The hearing transcript, however, makes clear that where the VE's testimony arguably was not consistent with the DOT, it was "based on [the VE's] professional experience . . . in the labor market since the early1990s, as well as Bureau of Labor statistics information and resources." R. 95 ("Q. . . . [W]as your testimony consistent with the *Dictionary of Occupational Titles*? A. Yes,

Your Honor. To the extent it goes beyond that with regards to case use [and] absenteeism

standards, . . . those would be based on my professional experience . . . as well as Bureau of

Labor statistics information and resources."). Crystal does not challenge the ALJ's reliance on

the DOT, the VE's supplemental testimony, or suggest that the ALJ failed to resolve any

apparent conflict between the VE's testimony and the DOT. *See generally Pearson v. Colvin*,

810 F.3d 204 (4th Cir. 2015). Thus, the ALJ's finding that there was a reasonable explanation for

the discrepancy between the VE's testimony and the DOT is supported by substantial evidence,

and any error by the ALJ in not further explaining that finding would not change the outcome

here, and is thus harmless. *See Kersey v. Astrue*, 614 F. Supp. 2d 679, 696 (W.D. Va. 2009)

("Errors are harmless in social security cases when it is inconceivable that a different

administrative conclusion would have been reached absent the error.").

      Crystal's other argument focuses on the VE's testimony that a hypothetical person who

would miss one day of work for each medical appointment Crystal attended from 2017 to 2019

would be precluded from full-time employment. R. 94 (Attorney: "So, if this employee in 2017

had 20 medical appointments and 2018 41, in 2019 to date 44, that would be beyond what would

be allowed by an employer. Is that correct?" ALJ: "Is she missing work all those days?"

Attorney: "Yes." VE: "Yes. That would be preclusive of employment."). The ALJ, however, did

not find that Crystal would miss work to the extent of the hypothetical person that her attorney

identified to the VE. *See* R. 61, 65–66. Thus, the ALJ was not required to incorporate any limits

relating to such a rate of absenteeism into his RFC finding or in his operative hypothetical

question to the VE. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) ("In order for a

vocational expert's opinion to be relevant and helpful, it must be based on a consideration of all

other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out of the claimant's impairments.").

Relatedly, at oral argument before this Court, Crystal asserted that the ALJ had not sufficiently considered the VE's testimony that a hypothetical person with Crystal's sedentary RFC who also "cannot balance herself independent of [a] cane, and needs to hold on to the cane to stand up" at her workstation would "not be efficient at her job." R. 97. The ALJ did not ignore this testimony, however. The ALJ's RFC finding and operative hypothetical question allowed for use of a cane to ambulate, R. 93 ("should be allowed a cane to ambulate to and from the workstation"), which the VE said would permit the person to perform the sedentary jobs that the ALJ identified in his decision, R. 93–94. *See* R. 64–65. The ALJ also specifically found that Crystal could independently balance and "arise from a seated position," R. 60, and his RFC did not require the use of a cane to stand up, R. 61 ("she requires the use of a cane to ambulate"). Thus, the ALJ did not need to include in his operative hypothetical a limitation that was not in the RFC. Accordingly, I cannot find that the ALJ erred by relying on the VE's testimony.

*3.     "Conservative" Treatment*

Crystal next argues that the ALJ erred by discrediting her allegations of pain based on her cellulitis secondary to diabetes and diabetic neuropathy because she only received "conservative" treatment for these impairments. Pl.'s Br. 2. Crystal does not take issue with ALJ's classification of her treatment as "conservative." Instead, she argues that the ALJ erred by discrediting her subjective statements based on her "conservative" treatment without considering that she was unable to afford anything beyond "conservative" treatment. *Id.* Crystal correctly asserts that an ALJ may not discredit a claimant's allegations of pain based on the "conservative" nature of her treatment where she was unable to afford more aggressive recommended courses.

*See Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1986) ("A claimant may not be penalized for failing to seek treatment that she cannot afford."). Nevertheless, that is not what the ALJ did here.

ALJ Foster first observed that "on occasion, examinations show cellulitis secondary to diabetes, and diabetic neuropathy." R. 63. He found these impairments less severe than alleged, however, both because Crystal "ha[d] received conservative care to manage her symptoms, consisting of mainly oral medications" and because "[c]linicians ha[d] not advised her to pursue more aggressive treatment." *Id.* Thus, ALJ Foster did not discredit Crystal's subjective statements regarding her symptoms from cellulitis and diabetic neuropathy merely because she received "conservative" care, but rather because that was all that her providers believed was necessary to treat these impairments. "The Fourth Circuit has distinguished between a situation in which only conservative care is recommended versus a situation 'in which there is any suggestion that [a claimant] required more aggressive treatment yet received conservative treatments for other reasons.'" *Turk v. Berryhill*, No. 5:15cv73, 2017 WL 1184430, at *9 (W.D. Va. Mar. 29, 2017) (quoting *Dunn v. Colvin*, 607 F. App'x 264, 275 (4th Cir. 2015)). As such, where an acceptable medical source recommends a more aggressive treatment, failure to pursue such treatment may be held against a claimant who does not have a reasonable excuse (such as a lack of financial means) for not undergoing such treatment. In the other scenario described by the Fourth Circuit—where conservative treatment is all that is recommended by providers—an ALJ may question the severity of a claimant's symptoms based on the conservative nature of her treatment, "among other factors." *Dunn*, 607 F. App'x at 273. Whether or not Crystal could afford more aggressive treatment is irrelevant because providers had determined that the nature of her conditions did not warrant more than "conservative" treatment. It was not Crystal's failure

to pursue a more aggressive treatment course that led the ALJ to conclude her testimony was less than credible, it was the fact that no such course was required to begin with.

Further, the ALJ's conclusion that Crystal's clinicians did not recommend more aggressive treatment is supported by substantial evidence. Indeed, Crystal's clinicians repeatedly gave her almost identical instructions on controlling her diabetes-related issues: they told her to take insulin as directed, to adhere to a low-carb diet, to reduce her calorie and sugar intake, and to maintain basic foot hygiene. *See, e.g.*, R. 405 (RN Adams noting she "discussed with patient she needs to find calorie free drinks"); R. 671 (Crystal told to increase nightly Lantus dosage after increase in A1C); R. 1296 (noting that Amaryl and a new brand of insulin "really improved [Crystal's] blood glucose"); R. 1447 (prescribed Bactrim Double Strength for cellulitis of right heel); R. 1859 (Dr. Forrester recommending that Crystal "discontinue smoking and obtain better glucose control," but "defer[ring] treatment" for suspected necrobiosis lipoidica of right shin). Yet, Crystal often did not comply. Sometimes Crystal offered an excuse. *See* R. 1951 (Crystal stating she had trouble applying foot lotions because of her obesity). On other occasions, the record demonstrates a willful noncompliance with even the "conservative" measures recommended by her physicians. *See, e.g.*, R. 405 (Crystal stating she "took the bag home and put it in the fridge and didn't even look in the bag" after her doctor's office provided her with insulin); R. 820 ("I am not taking [my insulin] like I should. . . . I don't have the reminders in my phone yet"); R. 1187 (noting that Crystal was eating KFC during rounds, "seem[ed] to be non-compliant with diet and diabetes management," and threatened several times to leave the hospital against medical advice); R. 1866, 1952 (noting "poor foot hygiene"). At times, Crystal reported that she could not afford her medications, *see* R. 405 (noting Crystal lacked the funds to afford her diabetes pills "for a few days"); R. 673 (Crystal reporting she was out of diabetic testing

strips and medications because she could not afford them); R. 1424 (Crystal stating she was not sure for how much longer she could afford her diabetes supplies), but those instances were short lived, and the treatment notes show that Crystal regularly had access to diabetic medications, R. 405 (noting that Crystal had been provided with insulin and instructed on how to properly administer it); R. 647 (NP Guenthner instructing Crystal to increase nightly Lantus intake, and instructing her on administering insulin); R. 1424 (noting that Crystal was "really enjoying" her new glucose meter); *see also* R. 1296 (appointment for refills of insulin and Amaryl). She also had financial assistance through Valley Health and information about how to obtain free or low-cost medications. *See Mabe v. Colvin*, No. 4:12cv52, 2013 WL 6055239, at *7 (W.D. Va. Nov. 15, 2013). Thus, the ALJ could properly cite Crystal's noncompliance with recommended treatment as a basis to question her reports of disabling symptoms. Moreover, while the ALJ did question the severity of her symptoms, he nonetheless imposed a very restrictive RFC of sedentary work with postural limitations and use of a cane to walk. *See* SSR 96-9p, 1996 WL 374185, at *3.

Lastly, Crystal's "conservative" treatment was not the only factor ALJ Foster relied on in discrediting her allegations of pain from her cellulitis and diabetic neuropathy. The ALJ additionally cited Crystal's daily activities as demonstrating that her symptoms were less severe than alleged. Crystal raises no challenges regarding the ALJ's consideration or evaluation of her daily activities. Accordingly, I find that the ALJ's evaluation of Crystal's statements regarding her cellulitis and diabetic neuropathy withstands scrutiny. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (citing *Eldeco, Inc. v. NLRB*, 132 F.32 1007, 1011 (4th Cir. 1997)).

4.     *Consideration of UVA Health Records*

31

Crystal next asserts that the ALJ erred by failing to consider certain records of UVA Health, which she contends "document the ongoing issues [she] has with keeping the diabetes under control," and "document the neuropathy, nephropathy and necrobiosis lipoidica from the uncontrolled diabetes." Pl.'s Br. 2–3 (citing Ex. 19F, 20F; R. 1440–1677, 1679–1938). Crystal does not point to any specific finding that the ALJ purportedly failed to consider. *See Reid*, 769 F.3d at 865.

In his decision, the ALJ noted that Crystal "often experiences neuropathy . . . requiring antibiotic treatment." R. 62. Although he did not explicitly mention the exhibits Crystal cites when discussing her diabetic neuropathy, it is nonetheless clear that his consideration of that impairment and its related symptoms and alleged functional limitations was sufficient. Indeed, even the records Crystal cites do not establish any symptoms or limitations beyond what the ALJ already recognized—namely, that Crystal "often experiences neuropathy."

The records Crystal relies on demonstrate the following. Crystal complained of neuropathy at a February 2019 appointment at UVA Health. *See* R. 1442–50. Examination revealed a large lesion on her right shin that "look[ed] like a necrobiosis lipoidica," R. 1446, for which Crystal was referred to a dermatologist, R. 1447. Dr. Topchyan assessed uncontrolled diabetes complicated by neuropathy and nephropathy, R. 1446, and noted that "there [were] some neuropathy signs" when stating she would not consider prescribing Jardiance for Crystal's diabetes, R. 1447. In March, Crystal was assessed with chronic pain syndrome and neuropathy, which was noted to be treated with Lyrica. R. 1897. In April, when Crystal followed up with a dermatologist regarding the suspected necrobiosis lipoidica on her right shin, Dr. Forrester diagnosed necrobiosis lipoidica, but said that "[o]n clinical exam, it does not appear that she has active NDL," and he "recommend[ed] she discontinue smoking and obtain better glucose

control." R. 1859; *see also* R. 1755 ("For necrobiosis lipoidica diabeticorum – no treatment was

recommended."). Necrobiosis lipoidica does appear again on exam in May 2019, R. 1756, but,

the findings listed that day appear to be copied verbatim from her February 2019 appointment, R.

1446. And, although diabetic neuropathy is listed as a diagnosis, *see* R. 1751, there are no

corresponding exam findings or clinician's notes demonstrating that it caused functional loss.

Crystal has not identified, and the court has not found, any treatment notes that indicate

her neuropathy causes any functional limitations beyond those already accounted for in the

ALJ's analysis of her physical impairments. These records merely confirm the existence of

Crystal's neuropathy; they do not, however, support a more restrictive RFC finding than ALJ

Foster's conclusion that Crystal could perform "sedentary" work with additional limitations. *See*

*Felton-Miller v. Astrue*, 459 F. App'x 226, 229–30 (4th Cir. 2011); *McAnally v. Astrue*, 241 F.

App'x 515, 518 (10th Cir. 2007) (affirming denial of benefits where plaintiff did "not identify

any functional limitations that should have been included in the RFC [finding] or discuss any

evidence that would support the inclusion of any limitations"). Accordingly, I find that although

the ALJ did not specifically cite to the exhibits offered by Crystal in support of her position, his

analysis of her diabetic neuropathy and related impairments is nonetheless supported by

substantial evidence. *Reid*, 769 F.3d at 856 ("[T]here is no rigid requirement that the ALJ

specifically refer to every piece of evidence in his decision.").

     *5.    Consideration of Cellulitis*

Crystal also argues that the ALJ did not sufficiently consider "the ongoing issues [she]

faces regarding the cellulitis." Pl.'s Br. 2. According to Crystal, the medical records from Valley

Health "document the debriding of the sores and packing of the wounds and the continuous

monitoring for infection," and Crystal's "outbreaks can last up to 3 to 4 days which would affect

her ability to perform an active job and would cause her to potentially miss time from her place of employment." *Id.*

The ALJ's analysis, concise as it may be, accurately reflects the work-related limitations Crystal suffers from her cellulitis and is supported by substantial evidence. *See Keene*, 732 F. App'x at 177. The decision makes clear that the ALJ considered this evidence, *see* R. 62 ("Finally, she also has diabetes mellitus, type 2, and often experiences neuropathy and cellulitis infections requiring antibiotic treatment."), and that his discussion of that complication of her diabetes was a fair reflection of the treatment notes. The record reflects that Crystal was treated for cellulitis on three occasions. R. 373 (January 2018); R. 1075 (July 2018); R. 2324 (September 2019). Her treatment in July 2018 also included a hospital admission for sepsis. *See* R. 62 (discussing Crystal's cellulitis and citing R. 1182). The record also demonstrates that Crystal had a history of recurrent cellulitis prior to the relevant period. *See* R. 402.

As ALJ Foster recognized, this evidence demonstrates that Crystal "often" experienced issues with cellulitis requiring antibiotic treatment. Thus, ALJ Foster's observation that Crystal "often experiences neuropathy and cellulitis infections requiring antibiotic treatment" clearly demonstrates that the "ongoing issues" Crystal refers to in her brief were in fact considered. ALJ Foster then weighed that evidence against conflicting evidence showing no or mild signs and symptoms despite Crystal's poor selfcare and noncompliance with medical treatment. R. 62 ("Nonetheless, her clinicians note poor foot hygiene and poor compliance with medical advice."); *see also* R. 1866 (noting Crystal "denie[d] recent attempt[s] at self care" and "ha[d] not been using skin lotions as advised"); R. 404 ("There is no extensive cellulitic area or lymphangitic spread or signs of sepsis."); R. 629 ("No surrounding cellulitis."); R. 1153 (noting "no abscesses or indication of any cellulitis" in her pubic area, and "explain[ing] [that] her under

left breast area was probably more of a yeast type infection due to the humidity and brittle use"). Moreover, he recognized that Crystal "does experience some symptoms because of her severe impairments," and he accounted for these symptoms by restricting Crystal to a limited range of "sedentary" work. R. 63 (discussing Crystal's limitations from diabetes, neuropathy, and cellulitis, among other things, and finding, "[d]uring the period at issue, the pain and other symptoms associated with the claimant's impairments have limited her to work at the sedentary exertional level, and further affected her abilities to perform postural tasks, and to work in certain work environments."). Thus, the ALJ considered the evidence of Crystal's cellulitis, weighed that evidence against conflicting evidence, and "buil[t] an accurate and logical bridge from that evidence to his conclusion." *Woods*, 888 F.3d at 694 (emphasis omitted), As such, I find that the ALJ sufficiently considered Crystal's cellulitis and any associated limitations.

6.    *Consideration of Fibromyalgia*

Lastly, Crystal asserts that the ALJ erred in his consideration of the evidence of her fibromyalgia, but she does not identify any specific finding or conclusion that she asserts was an error. *See* Pl.'s Br. 3. Crystal identifies records from Valley Health, which she says demonstrate "an examination of [Crystal] which exhibited 16 out of the 18 tender point test which would confirm the diagnosis of Fibromyalgia" and "the ongoing chronic, widespread pain associated with Fibromyalgia." *Id.* (citing R. 1289–90). She also claims the Valley Health records "document the chronic pain of multiple joints to which the medical provider, Kayde Guenth[n]er referred [Crystal] to pain management for ongoing treatment." *Id.* (citing R. 1296–1324).

ALJ Foster discussed Crystal's fibromyalgia at step three, under Social Security Ruling 12-2p, and in assessing her RFC before step four. R. 61, 62. In his step-three discussion, the ALJ noted that Crystal "demonstrated positive trigger point at one occasion, and has generalized

complaints of myalgia." R. 61. Nonetheless, he found that Crystal's "severe" fibromyalgia did

not equal the severity of any listing-level impairment because she "ha[d] not presented with

widespread pain in all four quadrants for at least three months." *Id.* In assessing Crystal's RFC,

the ALJ noted Crystal's diagnosis of fibromyalgia and that she "demonstrated tenderness to

palpation at 16 of 18 sites in various muscle groups used in the diagnosis of fibromyalgia," and

"was prescribed gabapentin, and referred for pain management, but gabapentin provided her with

some improvement." R. 62. Other than Crystal's one visit with NP Guenthner when she

diagnosed fibromyalgia, the medical records barely mention this condition. Even so, the ALJ

considered Crystal's fibromyalgia and her other impairments in assessing a sedentary RFC,

which reflects significant limitations. Crystal has not identified how this RFC failed to

accommodate any limitations caused by her fibromyalgia, and, considering the limited evidence

of Crystal's fibromyalgia, I cannot find that the ALJ's discussion of the impairment or its effects

on Crystal's functioning is not supported by substantial evidence.

Accordingly, I find that the ALJ did not err in his assessment of Crystal's fibromyalgia.

### IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge

**GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 16, **DENY** Crystal's

Motion for Summary Judgment, ECF No. 14, **AFFIRM** the Commissioner's final decision, and

**DISMISS** this case from the Court's docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and
Recommendation], any party may serve and file written objections to such
proposed findings and recommendations as provided by rules of court. A judge of
the court shall make a de novo determination of those portions of the report or

specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to the parties.

ENTER: February 18, 2022

Joel C. Hoppe
U.S. Magistrate Judge

37